UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MIDWEST AUTO AUCTION, INC.,

       Plaintiff,

vs.                                         Case No. 11-14562

CLARENCE McNEAL, Individually,          HON. AVERN COHN
COUNTY OF WAYNE, METRO AUCTION
SERVICES, INC., and BOULEVARD &
TRUMBULL TOWING, INC.,

       Defendants.
_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANTS' MOTIONS TO DISMISS (Docs. 18 and 20)
## AND DISMISSING CASE

### I.  Introduction

      This is an action asserting antitrust and tort claims arising out of a bidding

process which resulted in an award of a contract to provide auction services for Wayne

County.  Plaintiff Midwest Auto Auction, Inc. (Midwest) is suing defendants Boulevard &

Trumball Towing (B&T), its subcontractor, Metro Auction Services (MAS), Wayne

County, and Clarence McNeal (McNeal), the former Purchasing Director for Wayne

County.  Midwest generally claims violations of federal and state anti-trust law and

tortious interference under state law.  The First Amended Complaint (FAC) (Doc. 16),

which runs 42 pages and 337 paragraphs, asserts the following fifteen claims, phrased

by Midwest as follows:

Count I          Restraint of Trade Resulting in Sherman Act, 15 U.S.C. §1,
                 Et seq, and Clayton Act Section 12 Violations as to Defendant
                 McNeal

Count II         Unfair Trade Practices Resulting in Michigan Antitrust, MCL
                 445.771 et eq Violations as to Defendant Clarence McNeal

Count III        Tortious Interference with an Advantageous Business
                 Relationship or Expectancy as to Defendant Clarence McNeal

Count IV         Civil Conspiracy as to Defendant Clarence McNeal

Count V          Restraint of Trade Resulting in Sherman Act, 15 U.S.C. §1,
                 Et seq, and Clayton Act Section 12 Violations as to Defendant
                 County of Wayne

Count VI         Unfair Trade Practices Resulting in Michigan Antitrust, MCL
                 445.771 et eq Violations as to Defendant County of Wayne

Count VII        Restraint of Trade Resulting in Sherman Act, 15 U.S.C. §1,
                 Et seq, and Clayton Act Section 12 Violations as to Defendant
                 Metro Auction Services, Inc.

Count VIII       Unfair Trade Practices Resulting in Michigan Antitrust, MCL
                 445.771 et eq Violations as to Defendant Metro Auction Services,
                 Inc.

Count IX         Defendant Metro Auction Services, Inc. Engaged in Predatory
                 Pricing in Violation of Michigan and Federal Anti-Trust Laws

Count X          Tortious Interference with an Advantageous Business
                 Relationship or Expectancy as to Defendant Metro Auction
                 Services, Inc.

Count XI         Civil Conspiracy as to Defendant Metro Auction Services, Inc.

Count XII        Restraint of Trade Resulting in Sherman Act, 15 U.S.C. §1,
                 Et seq, and Clayton Act Section 12 Violations as to Defendant
                 Boulevard & Trumbull Towing, Inc.

Count XIII       Unfair Trade Practices Resulting in Michigan Antitrust, MCL
                 445.771 et eq Violations as to Defendant Boulevard & Trumball
                 Towing, Inc.

Count XIV        Defendant Boulevard & Trumball Towing, Inc. Engaged in

2

Predatory Pricing in Violation of Michigan and Federal Anti-Trust Laws

Count XV    Tortious Interference with an Advantageous Business Relationship or Expectancy as to Defendant Boulevard & Trumball Towing, Inc.

Before the Court are separate motions to dismiss by B&T and MAS (Doc. 20)[1] and Wayne County and McNeal (Doc. 18). Both motions raise essentially the same arguments. That is, that the FAC is subject to dismissal for failure to state a claim under Rule 12(b)(6)[2] because Midwest has not plead a plausible claim for antitrust injury. Defendants also contend that Midwest's tort claims fail to state a claim. In short, it is defendants' position that the FAC reveals nothing more than a disappointed bidder who seeks legal redress for its failed bid against its competitors, B&T and MAS, who were awarded the bid from Wayne County. The Court agrees. Accordingly, defendants' motions will be granted and this case will be dismissed.

## II.  Background/FAC

### A.  The Invitation to Bid

On February 11, 2010, Wayne County issued an Invitation to Bid for Vehicle and Equipment Auction Service (Invitation) for the "purpose of providing vehicle and equipment auction services for Wayne County DPS Equipment Division.". FAC at ¶ 28. Under the Invitation, Wayne County sought and received bids from five competing

---

[1]B&T and MAS's motion is an amended motion to dismiss. They filed an initial motion to dismiss based on the original complaint. The amended motion is aimed at the FAC.

[2]B&T and MAS have also moved to dismiss for lack of subject matter jurisdiction due to lack of standing under Fed. R. Civ. P. 12(b)(1).

3

vendors for the towing and auctioning of surplus vehicles responsive to the bid.  FAC at

¶ 64.  Both Midwest and B&T submitted bids in response to the Invitation.  FAC at ¶¶

35, 38.  There is no dispute that Wayne County ultimately accepted the lowest

responsible bid.  FAC at ¶ 39

     The Invitation had several requirements relating to geographical distance,

licensing, and experience.  FAC at ¶ 30.  For instance, Wayne County required bidders

to have a location within 15-miles from Wayne County's equipment yard purportedly "to

minimize costs associated with transportation of items and auctions."  FAC at ¶ 32.

     From Wayne County's perspective, it was important that the Invitation be

competitively bid because the auction was generating revenue for it.  A competitively bid

contract assured Wayne County that compensation paid to the successful vendor is

limited in an effort to generate the best net return.  Section 8.01 of the Form Contract

("Contract") (included in the Invitation) defined vendor compensation under the Invitation

as follows:

> (1) a commission fee by Wayne County for auctioning services, from the auction proceeds;
> (2) a buyer's commission charged by the vendor to a buyer at an auction; and
> (3) transportation costs by Wayne County if a vehicle were to be towed from the County maintenance yard located on Goddard Road in Romulus.

See Wayne County's Ex. A at 13, App. C at 39.  Although these are the only forms of

"remuneration," to the successful bidder from Wayne County, the Invitation and Contract

do not prohibit the vendor from charging other additional fees at the auctions.

     The third form of remuneration, "transportation costs," had three elements:  (1)

towing hookup (price per hookup); (2) towing rate per mile; and (3) trailer hauling for

larger vehicles.  Id. at 39, App. C.  In calculating each element, the Invitation relied on

estimates.  Wayne County's Ex. A at 7, 5.  ("[t]he quantities indicated are reasonable approximates of the County's anticipate usage").  For instance, the Invitation estimated that Wayne County would haul vehicles about 3,000 miles over the three years of the contract.  To minimize transportation costs, Wayne County's Department of Public Works (whose surplus vehicles were auctioned) wanted vendors to be within a 15 mile radius of its Goddard maintenance yard.  Id. at 7, 2.

B&T's bid identified two possible locations in its bid, one at 7900 Dix Road inn Detroit, Michigan, which is within the 15 mile radius, and one just outside the radius at 2411 Vinewood, Detroit.

The Invitation required bidders to submit pricing for two separate categories: Commission and Transportation Cost.  See Ex. A, p. 4 to B&T and MAS's motion. Under the heading "Transportation Cost," the Invitation's price sheet had, among other things, one price line for "Towing Hookup" and one price line for "Towing Rate per mile." Id. at p. 39.  Although the price sheet had just one line for "Towing Hookup," Midwest's bid apparently contained two prices for "Towing Hookup."  FAC at ¶¶ 52, 53, 55. Indeed, Midwest bid $140.00 per tow for vehicles over 12,000 pounds, and $55.00 per tow for vehicles under 12,000 pounds).  B&T's bid, unlike Midwest's, contained just one price for "Towing Hookup," $30.00, which was much lower than Midwest's bid.  See Ex. B to B&T and MAS's motion, Official Bid Tabulation; FAC at ¶¶ 52, 53, 55.

According to Wayne County, section 1 is a standard provision in all of its Invitations and grants it discretion to review, accept and reject bids.  Id. at 3-6. Paragraph of 10 of section 1 provides in relevant part:

The County reserves the right to reject any or all bids, or to accept or reject any

5

bid in part and to waive any minor informality or irregularity in bids received if it is determined by Purchasing Director that the best interest of the County will be served by doing so.

Id. at 4, 10.

### B.  The Bidding Process

When Wayne County issued its Official Bid Tabulation, it identified B&T as the lowest bidder, Martin's Towing & Auto Sales as the second lowest bidder, and Midwest as the third lowest bidder.  FAC at ¶ 47; Ex. B.  Wayne County used Midwest's price of $140.00 per tow in determining that the it was the third lowest bidder.  B&T and MAS's Ex. B; FAC at . ¶¶ 47, 52.  Midwest says that Wayne County miscalculated its bid.  FAC at ¶ 47.  However, Midwest also says that B&T submitted the lowest bid.  FAC at ¶ 39.

In the Official Bid Tabulation, Wayne County deemed B&T as "non responsible" because it "exceeded 15 mile limit required in Invitation."  B&T and MAS's Ex. B.  Wayne County notified M&T of this on May 27, 2010.  Initially, Wayne County intended to recommend non party, Martin's Towing & Auto Sales, for award of the Invitation's contract.  FAC at ¶ 46.

On June 2, 2010, B&T filed a bid protest.  FAC at ¶ 49; See Ex. C to B&T and MAS's motion.  Wayne County Ordinance, § 120.161(a), provided for a formal protest procedure.[3]

---

[3]While Midwest says it "made many unsuccessful attempts to contact [Wayne County] to object to and further discuss the discrepancy in the bid amounts," Midwest does not allege that it submitted a formal bid protest under Wayne County Ordinance § 120.161(a).  Instead, Midwest says it made telephone calls to Wayne County.  FAC at ¶¶ 48, 52.

The protest made two arguments.  FAC at ¶ 49.  First, B&T was "responsive" because its bid identified a location within the 15-mile exclusionary zone, B&T and MAS's Ex. C, pp.1-2.  Second, B&T argued that the 15-mile exclusionary zone would not minimize Wayne County's transportation costs.  According to B&T, mileage pricing, not geographical distance, proved more determinative for minimizing Wayne County's cost.  FAC at ¶ 51; B&T and MAS's Ex. C, pp. 3-4, n 1-2.

On July 13, 2010, Wayne County, through McNeal, granted the protest, noting that it had overlooked the Dix Highway address which was within the geographical range.  FAC at. ¶ 61; Letter, B&T and MAS's Ex. D (July 13, 2010). Wayne County then awarded the contract to B&T (the "Auction Contract").  FAC at ¶ 56.

Also, on July 13, 2010, Wayne County, through McNeal, wrote Midwest advising that it had accepted B&T's bid.

On October 21, 2010, the Wayne County Commission approved B&T as the vendor on the auction contract.  See B&T and MAS's Ex. E, Minutes.

### C.  Midwest's Allegations of Wrongdoing in the Bidding Process

Midwest says that Wayne County's decision to award the auction contract to B&T "suspicious" and "miraculous" because "the Invitation required the bidders storage yard and office to be within a 15 mile radius of the county's Goddard Road address."  FAC at ¶ 62.  As a result, Midwest asserts that B&T and MAS have generated "approximately $40,000" in revenue.  FAC at ¶ 65.  Midwest also says that "private consumers of auction services constitute less than 15% of the auction services market within the County of Wayne," governmental agencies constitute the majority of the auction services market, and B&T allegedly has a 75% share of this market in Wayne County.

7

FAC at ¶¶ 66, 67.  According to Midwest, B&T "in recent years . . . has obtained contracts to auction vehicles, trucks and equipment for the City of Detroit, the U.S. Marshalls (sic) Service, the FBI, the Michigan State Police, and the City of Hamtramck, among others."  FAC at ¶ 67.   Midwest also asserts that B&T drove its competitors out of Wayne County "contract-by-contract."  FAC at ¶¶ 254, 321.  Even though Midwest does not tow for the Detroit Police Department, Midwest says that B&T is "attempting to monopolize towing calls in the City of Detroit," and this leads to "an increase in the providing of auctioning services within the County of Wayne . . . [because] whenever a vehicle's owner does not retrieve the impounded vehicle, the vehicle is auctioned per City of Detroit Rules." FAC at ¶¶ 71-77.

Additionally, Midwest says that at the very first auction under the auction contract, B&T and MAS "charged multiple fees in an effort to recoup its losses that resulted from submitting a below average variable cost bid."  FAC at ¶ 82.  If these fees were added to B&T's bid, Midwest alleges it would have "greatly increased" B&T's bid. FAC at ¶ 83.  Charging these alleged excess fees, Midwest says, "has caused a decrease in the number of potential buyers who attend the auctions."  FAC at ¶ 89.  "Ultimately the consumer Defendant Wayne County was damaged because the revenue it received from the auctions was far less than if Wayne County would have contracted with Plaintiff and/or one of the other bidders."  FAC at ¶ 93.

Midwest essentially asserts the following "antitrust injuries:"

• Midwest and other bidders on the auction contract are being "forced out of the auctioning services industry";

• Wayne County is receiving substandard service and "the revenue generated is greatly reduced";

8

- the "potential purchasers of the auctioned vehicles . . . are forced to pay exorbitant fees";

- these purchasers have "been deprived of free and open competition in the auction service industry within the County of Wayne";

- "price competition between auction service providers has been restrained, suppressed, or eliminated";

- "pricing . . . has dropped below competitive levels."

See e.g., FAC at ¶¶ 210, 230, 252, 283, 302, 319.

### III.  Legal Standard

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the sufficiency of a complaint.  To survive a Rule 12(b)(6) motion to dismiss, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007).  See also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007).  The court is "not bound to accept as true a legal conclusion couched as a factual allegation."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Moreover, "[o]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Id. at 679.  Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.  While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Id.  In sum, "[t]o survive a motion to

9

dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." Id. at 678 (internal quotation marks and citation omitted).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents referenced in the pleadings and central to plaintiff's claims, (2) matters of which a court may properly take notice, (3) public documents, and (4) letter decisions of government agencies may be appended to a motion to dismiss.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2509 (2007).
When standing is called into question, a court may consider matters outside of the pleadings.  Cleveland Branch, NAACP v. City of Parma, 263 F.3d 513, 524 (6th Cir. 2001).

Here, the FAC repeatedly refers to, and extensively relies upon, the Invitation and other documents.  See FAC at ¶¶ 26, 28-32, 46.  As such, the Court has considered these documents in ruling on the motions to dismiss.

IV.  Analysis

A.  Antitrust Injury

1.

All of the defendants argue that the antitrust claims asserted against them under Counts I, II, V, VI, VII, VIII, IX, XII, XIII, and XIV must be dismissed because Midwest has failed to allege an antitrust injury.  The Court agrees.  To maintain an action under the Sherman Act, a plaintiff must allege facts tending to show a critical "antitrust injury."  Brunswick Corp. v. Pueblo-Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977).  An "antitrust injury" is a prerequisite to maintaining a claim under Section 1 and 2 of the Sherman

Act, being 15 U.S.C. §§ 1, 2.  Indeck Energy Services, Inc. v. Consumers Energy Co., 250 F.3d 972, 978 (6th Cir. 2000).  This Court has held that, to establish an antitrust injury, a plaintiff must plead: "(1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." Baum Research and Development Co. v. Hillerich & Bradsby Co., 31 F. Supp. 2d 1016, 1022 (E.D. Mich. 1998) (quoting Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 88 (6th Cir. 1989)).  Stated another way, a private antitrust plaintiff bringing suit under the Sherman Act must plead facts tending to show "antitrust injury," a concept akin to standing.[4]  "A private antitrust plaintiff does not acquire standing merely by showing that he was injured in a proximate and reasonably measurable way by conduct of the defendant violating the antitrust laws."  III Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 362a at 209–10 (1995).  Midwest has not met this standard.

-----

[4]B&T and MAS have moved to dismiss under Fed. R. Civ. P. 12(b)(1) based on Midwest's lack of standing.  This argument is based on Midwest's failure to alleged an antitrust injury, which is not exactly the same as Article III standing.  As the Court has explained:

> The related concepts of antitrust injury and antitrust standing are often confused. This confusion occurs because the two concepts "share a common ingredient." The common ingredient is that both requirements limit "recovery to those who have been injured by restraint on competitive forces in the economy." Any inquiry to determine whether antitrust injury has been shown is more limited than one to determine whether the plaintiff has standing. The single determinant of antitrust injury is whether the plaintiff has suffered an "injury the type the antitrust laws were intended to prevent and that flows from that which makes [a defendant's] act [ ] unlawful." On the other hand, even if an antitrust injury is shown sufficiently, standing may be denied on the basis of other factors. The purpose of the additional inquiries is to confine recovery to cases that promote the congressional intent to ensure that consumers receive the benefits of competitive markets.

Baum, 31 F. Supp. 2d at 1022 n. 6.

Midwest's claims under Section 1 of the Sherman Antitrust Act and the Michigan Antitrust Reform Act, MCL § 445.772 (MARA)[5] are not plausible because Midwest has not alleged an antitrust injury to competition arising from B&T and MAS's submitting of the lowest bid in response to the Invitation. Midwest has not asserted that B&T's alleged collusion with Wayne County reduced competition in the relevant market and that its injury resulted from this decrease in competition. Instead, Midwest claims economic injury to itself and competitors as a result of not receiving the Auction Contract. See FAC at ¶¶ 64-65. Courts have made clear that the antitrust laws are designed for "the protection of competition, not competitors." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-89 (1977) (emphasis in original).

A careful review of the FAC reveals that there is little specificity in the allegations of the FAC. For the most part, the allegations are general and do not cite to any document supporting them. An example is paragraph 90 which consists of a charts which purports to compare vehicle sale prices at an auction run by B&T and one run by Midwest. However, there is no information as to date, time, place of the described auctions or as to a buyer. There are no exhibits attached to the FAC.

2.

Although Midwest contends otherwise, its antitrust claims are based on its status

_____

[5]Both Michigan and Federal courts have noted that MARA is patterned after the Sherman Act. "The Michigan antitrust act is patterned after the Sherman Antitrust Act, 15 U.S.C. § 1 et seq., and Federal court interpretations of the Sherman Act are persuasive authority as to the meaning of the Michigan act." Goldman v. Loubella Extendables, 91 Mich.App. 212, 219 (1979). MARA "adopted language from and is interpreted consistent with the Sherman Act, 15 U.S.C. § 1." Perceptron, Inc. v. Sensor Adaptive Machs. Inc., 221 F.3d 913, 919 n. 6 (6th Cir. 2002). Thus, courts have applied the same analysis to claims under the Sherman Act and MARA.

12

as a disappointed bidder.  The Sixth Circuit has rejected this kind of claim.  In Expert Masonry v. Boone County, 440 F. 3d 336, 346 (6th Cir. 2006), the plaintiff, Expert Masonry, sued the defendant, Boone County Fiscal Court, over its award of two construction contracts to co-defendants (collectively DSM).  The bid instructions stated that "[defendant] reserved the right 'to reject any or all Bids,' and that [defendant] 'shall have the right to waive informalities and irregularities in a Bid received and to accept the Bid which, in [defendant's] judgment, is in [defendant's] own best interest."  Id. at 349. Plaintiff, the second lowest bidder, challenged the bidding process claiming that DSM did not meet the bid specifications as it relates to bonding, while plaintiff met this requirement for both bids.  Defendant concluded that DSM's bid was sufficient and awarded the contract to it.  Plaintiff sued defendant and DSM alleging antitrust violations.  The district court dismissed the claims.

The Sixth Circuit affirmed the dismissal on the grounds that the allegations failed to allege an antitrust injury.  The court of appeals "decline[d] to extend antitrust liability to give succor to dejected buyers or sellers who simply allege that one buyer and one seller colluded to reach a deal that may or may not have been inferior to the deal offered by the disappointed party."  Expert Masonry, 440 F.3d at 348.  The court of appeals also noted that "[i]t is clear that the injury alleged here has not been previously found to be a cognizable antitrust violation under the Sherman Act in analogous situations."  Id. at 346 (citing Ace Beer v. Kohn, 318 F.2d 283, 287 (6th Cir. 1963)).  The Sixth Circuit explained:

> [I]n the absence of a showing of market power or some other convincing rationale, we decline to extend antitrust liability to give succor to dejected buyers and sellers who simply allege that one buyer and one seller colluded to reach the

13

>deal that may or may not have been inferior to the deal offered by the
>disappointed party.

Id. at 348.  The court of appeals further stated that "parties may break a host of state or

federal laws and regulations in making a side deal or in otherwise circumventing the

bidding process in reaching a final arrangement, but they do not breach Section 1 of the

Sherman Act where the alleged vertical agreements involve only one buyer and one

seller."  Id.  Without a showing that a judgment in favor of the plaintiff-competitor will

confer some benefit on market consumers, it is presumed that antitrust injury is lacking.

Midwest's allegations, fairly read, are virtually no different than those in Expert

Masonry.  Like Expert Masonry, where the disappointed bidder claimed that the

successful bidder on a county contract failed to meet the bid specifications, Midwest's

FAC alleges that B&T and MAS failed meet the Invitation specifications.  The entire

premise for Midwest's Section 1 claim is that B&T was not within 15-miles from Wayne

County's equipment yard, contrary to the Invitation's requirement.  FAC at ¶¶ 30, 32, 40,

49, 62, 64, 100, 143, 260, 327.  As in Expert Masonry, where the bid specifications

permitted BCFC to reject "any and all bids" or to "waive irregularities," 440 F.3d at 349,

the Invitation in this case granted Wayne County the same authority.  Wayne County,

however, did not need to waive irregularities because, after receiving the protest, it

determined that B&T was a responsible bidder.

While Midwest alleges that the bidding process was "designed to eliminate or

destroy competitors and further B&T's attempted monopoly," FAC at ¶ 115, it was the

increase in competition which caused the underlying harm.  Notably, the purported

injury occurred only after Wayne County re-evaluated B&T's bid and award the Auction

14

Contract to B&T.  In other words, the competitive bid process allegedly caused the injury.  Thus, the main thrust of the FAC – Midwest's inability to compete in the auction services industry stemming from Wayne County's award of the Auction Contract to a competitor – lacks the "necessary predicate."  Although Midwest alleges that the bidding process was "designed to eliminate or destroy competitors and to further B&T's attempted monopoly," it was the increase in competition which caused the underlying harm.  FAC at ¶ 115.  Midwest alleges injury to itself only after Wayne County re-evaluated and awarded B&T the contract.  Therefore, the competitive bid process, and nothing else, caused the alleged injury.

The FAC makes clear that resulting injury was to Midwest and its <u>competitors, not to competition</u>:

> As a result of B&T's below average variable cost bid, and McNeal's manipulation of Plaintiff's bid, Martin's Towing, Plaintiff Midwest, A-1 Auto Auction, Inc., Manheim Auctions Government Services, LLC and any other auctioning company that because it was outside of the 15 mile radius did not bid on the contract, as competitors of B&T and MAS, were damaged because of the lost opportunity to provide these auctioning services within the County of Wayne.

FAC at ¶ 64.  Paragraph 65 echoes this allegation and asserts that Midwest's business would benefit from the contract:  "Had Plaintiff been awarded the Wayne County contract, its revenue would have been enough to sustain its workforce." <u>Id</u>. 65.  These allegations fail to make the critical distinction between conduct that <u>injures competition</u> and conduct which <u>injures competitors</u>.  The latter injury is not actionable as an antitrust claim.  <u>See Richter Concrete Corp. v. Hilltop Concrete Corp.</u>, 691 F.2d 818, 825 (6th Cir. 1982).  To be sure, the very nature of competitive bidding results in 1 winner and many losers.  Midwest, as a disappointed bidder, has not suffered an injury cognizable

under the Sherman Act.

### B.  Adverse Effect on the Market

Defendants also contend that the FAC fails to properly allege an adverse effect on the relevant market.  The Court agrees.  Midwest has not plead any such harm.  According to Midwest, in the alleged market of auction services, the buyer, Wayne County, paid less to B&T than the amount Midwest bid.  Wayne County paid less to B&T in transportation costs (B&T bid $5,250 compared to Midwest's initial and unchanged bid of $11,625) and slightly less in commission to B&T (3% versus 4% offered by Midwest).  In short, Wayne County is the consumer who chose the lowest bidder.  "If no consumer interest can be discerned even remotely in a suit brought by a competitor-if, as here, a victory for the competitor can confer no benefit, certain or probable, present or future, on consumers-a court is entitled to question whether a violation of antitrust law is being charged."  Brunswick Corp. v. Riegel Textile Corp., 752 F.2d 261, 266-67 (7th Cir. 1984).

However, Midwest alleges that Wayne County, as the consumer, was injured as a result of B&T's "exorbitant fees."  This argument is misplaced.  First, as described above, Wayne County pays the vendor in only two ways: (1) commissions from auction proceeds; and (2) transportation costs.  The terms of the auction contract defined what Wayne County pays the vendor, and did not expressly prohibit the vendor from charging additional fees at the auctions.  If the vendor charged "exorbitant fees" which materially impact its contractual performance (i.e., reduce attendance and in turn revenue), Wayne County may pursue a contractual remedy against the vendor.  See Nynex Corp. v. Discon, 525 U.S. 128, 137 (1998) (other remedies for various "competitive practices

16

thought to be offensive to proper standards of business morality").  However, Midwest was not a party to the auction contract and is therefore unable to raise or allege injury to Wayne County.  Second, even assuming the fees are exorbitant and Wayne County's revenues from the contract decline, the next time it comes up for bid Wayne County may look for a different vendor.  Third, there is no allegation that the reduced revenue is otherwise harming competition in the auction industry services.  Wayne County is still receiving revenue and there is no allegation that other consumers (i.e. other governmental entities) were also being harmed.

### C. Twombly/Iqbal Deficiencies

Defendants also contend that the FAC fails to allege a plausible claim for relief under the antitrust laws, particularly § 1 of the Sherman Act.  Section 1 provides, in pertinent part, that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal." 15 U.S.C. § 1.  Section 1 prohibits a small category of agreements that have been found to be per se illegal, and courts analyze all other alleged restraints on trade under the "rule of reason," which as its name suggests, "requires the factfinder to decide whether under all circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."  Id.

As an initial matter, although Midwest has not argued that the alleged violations are per se illegal or must proceed under the rule of reason analysis, the alleged actions are not per se illegal in the antitrust context.  Per se violations arise from "'[a]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal

17

without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.' " Foundation for Interior Design Educ. Research v. Savannah Coll. of Arts & Design, 244 F.3d 521, 529 (6th Cir. 2001) (quoting Northern Pac. Ry. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).  Instead of a per se violation, defendants' actions are best described as a "vertical restraint on trade," that is, not a horizontal agreement between competitors, but a "combination[ ] of persons at different levels of the market structure, such as manufacturers and distributors." Bailey's, Inc. v. Windsor Am., Inc., 948 F.2d 1018, 1027 (6th Cir.2001) (citation omitted). "Vertical restraints on trade are examined under a rule of reason analysis unless they include some agreement on price or price levels." Ezzo's Invs., Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 987 (6th Cir. 2001).

In order to show that a vertical restraint on trade violates the rule of reason and Section 1 of the Sherman Act, a plaintiff must show:

> (1) that the antitrust defendant contracted, combined, or conspired; (2) that the combination or conspiracy produced adverse anticompetitive effects (3) within relevant product and geographical markets; (4) that the objects of and conduct pursuant to that contract or conspiracy were illegal; and (5) that the plaintiff was injured as a proximate result of that conspiracy.

International Logistics Grp., Ltd. v. Chrysler Corp., 884 F.2d 904, 907 (6th Cir.1989) (citing Crane & Shovel Sales Corp. v. Bucyrus–Erie Co., 854 f.2d 802, 805 (6th Cir.1988)).

There are no specific factual allegations in the FAC showing the plausibility of a bid rigging conspiracy.  The pertinent paragraphs in the FAC as to Wayne County and McNeal are:

57:    "Defendants B&T and MAS, through its varied Fiore representatives, had

18

numerous opportunities to conspire, contract, and combine with Defendant McNeal.

58:     Defendant McNeal is available via "direct dial telephone"; "internet"; "signed letters"; and "in direct contact with other co-conspirators within Wayne County (i.e., Robert Futuna . . . Benny Napolean)";

59:     B&T "heavily donate" to Futuna and Napolean's "election efforts"; and

60:     Futuna and Napolean "had numerous opportunities" to conspire with B&T, its owners and McNeal at "varied . . . events (i.e., birthday parties, election parties, campaign fundraisers, and charity events like the annual Easter egg hunt)."

Conclusory allegations of "numerous opportunities" do not pass muster under the pleading requirements under Twombly and Iqbal.  Given the importance of the underlying agreement to a viable Section 1 claim, the Supreme Court in Twombly highlighted an important distinction between "lawful parallel conduct" and "unlawful agreements."  "It makes sense to say . . . that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  Twombly, 550 U.S. at 556-57. Where, as here, allegations of parallel conduct are set out in order to establish a Section 1 claim, "they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  Id.

The FAC and associated documents shows separate, independent conduct. Wayne County rejected B&T's bid in writing, and only reconsidered it based on B&T's formal written bid protest.  The fact, as alleged by Midwest, that Wayne County initially rejected B&T's bid and only reconsidered it based on a written, formal bid protest evidences separate, parallel conduct by B&T and Wayne County:

19

On the official bid chart, Defendant B & T was identified as being non-responsible because its location as tabulated from 2411 Vinewood exceeded the 15 mile limit requirement.  FAC at ¶ 40.

On or about May 27, 2010, Defendant County determined that Martin's Towing was the successful bidder . . . ."  FAC at ¶ 46.

Upon further inspection, Plaintiff discovered that Defendant County . . . incorrectly tabulated its bid.  FAC at ¶ 47

On or about July 12, 2010, Defendant County sent out a letter confirming that it reevaluated the bids and that Defendant B & T would be the lowest responsive and responsible bidder.  FAC at ¶ 61

These allegations do not describe any direct conduct between B&T and Wayne County which could plausibly suggest anticompetitive behavior.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality."  Twombly, 550 U.S. at 556-557.

Moreover, the Sixth Circuit has rejected a plaintiff's effort to survive a Rule 12(b)(6) challenge by pleading an "opportunity to conspire."  See In re Travel Agent Com'n Antitrust Litigation, 583 F.3d 896, 905 (2009) (the amended complaint "aver[s] only an opportunity to conspire, which does not necessarily support an inference of illegal agreement . . . [and] plaintiffs' attempt to distinguish Twombly on the basis that plaintiffs allege 'actual agreement' fails.") (emphasis added).  "Numerous opportunities" are not sufficient.  Indeed, Midwest's allegations of parallel conduct do not possibly suggest an illegal agreement because "it was not only compatible with, but indeed [is] more likely explained by, lawful unchoreographed free-market behavior."  Twombly, 550 U.S at 556-557.

20

C.  Predatory Pricing

Counts IX and XIV assert claims against B&T and MAS for predatory pricing. B&T and MAS argue that these claims must be dismissed because they are not properly plead.[6]  Although the FAC cites Section 1 of the Sherman Act "et. seq."  It is assumed that Midwest makes a claim under Section 2 of the Sherman Act for attempted monopolization which encompasses a predatory pricing claim.  "Section 2 of the Sherman Act makes it unlawful to 'monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations.' " Pacific Bell Telephone Co. v. Linkline Communications, Inc., 555 U.S. 438, 447 (2009) (quoting 15 U.S.C. § 2). Liability under § 2 is not premised merely on the existence of monopoly power.  As the Supreme Court explained in Pacific Bell, "[s]imply possessing monopoly power and charging monopoly prices does not violate § 2; rather, the statute targets 'the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " Id. at 447–48 (quoting United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)); see also, Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004).  Thus, to establish a claim of attempted monopolization under § 2, a plaintiff must allege and prove "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous

---

[6]B&T and MAS also contend that to the extent Midwest brings these claims under 15 U.S.C. § 13a, they must be dismissed because no private cause of action exists under this section.

21

probability of achieving monopoly power." <u>Spectrum Sports, Inc. v. McQuillan</u>, 506 U.S. 447, 456 (1993).

One way in which an antitrust plaintiff may establish the first element is by showing that the defendant engaged in a practice of predatory pricing, that is, offering "Below-cost prices that drive rivals out of the market and allow the monopolist to raise its prices later and recoup its losses." <u>Pacific Bell</u>, 555 U.S. at 448. "In a typical predatory-pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business. Then, with competition vanquished, the predator raises output prices to a supracompetitive level." <u>Weyhaeuser Co. v. Ross–Simmons Hardwood Lumber Co.</u>, 549 U.S. 312, 318 (2007) (citing <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 584–85 n. 8, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In order for a predatory pricing "scheme to make economic sense, the losses suffered from pricing goods below cost must be recouped (with interest) during the supracompetitive-pricing stage of the scheme." <u>Id</u>. Thus, the Supreme Court has "established two prerequisites to recovery on claims of predatory pricing." <u>Id</u>. " 'First, a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." <u>Id</u>. (quoting <u>Brooke Group Ltd. v. Brown & Williamson Tobacco Corp</u>., 509 U.S. 209, 222, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993)). This showing is required, the Supreme Court explained, because " 'as a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control,' " and because courts must be

22

"particularly wary of allowing recovery for above cost price cutting" which would "perversely, 'chill legitimate price cutting' which directly benefits consumers." Id. at 319 (quoting Brooke Group, 509 U.S. at 223–24). Second, to establish a predatory pricing claim, "a plaintiff must demonstrate that 'the competitor had ... a dangerous probabilit[y] of recouping its investment in below-cost prices.' " Id. at 318–19 (quoting Brooke Group, 509 U.S. at 224) (alteration by Court). This element is necessary because "without a dangerous probability or recoupment, it is highly unlikely that a firm would engage in predatory pricing.' Id. The Supreme Court has described these two prerequisites to a predatory pricing claim as " 'essential components of real market injury' that [are] 'not easy to establish." Id. at 320 (quoting Brooke Group, 509 U.S. at 226). The Supreme Court has also cautioned courts to analyze predatory pricing claims rigorously, explaining that "the costs of erroneous findings of predatory-pricing liability [are] quite high because 'the mechanism by which a firm engages in predatory pricing-lowering prices-is the same mechanism by which a firm stimulates competition,' and, therefore, mistaken findings of liability would 'chill the very conduct the antitrust laws are designed to protect." Id. (quoting Brooke Group, 509 U.S. at 226) (in turn quoting Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 122 n. 17, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)).

Midwest alleges that B&T submitted a bid that was below B&T's average variable cost in response to the Invitation and, to recoup its losses, charged additional, "undisclosed fees" ("Unlisted Fees") that "violate the provisions of the Invitation". FAC at ¶¶ 82, 86, 97, 99. However, Midwest does not cite to any portion of the Invitation that prohibits the unlisted fees, nor offer any explanation to rebut defendants' position that the Invitation does not expressly prohibit the vendor from charging additional fees at the

23

auctions.  In short, these allegations do not support a predatory pricing claim.

The FAC, fairly read, demonstrates that B&T and MAS never incurred a loss through predation, as B&T/MAS charged the unlisted fees at the very first auction and every auction thereafter.  See FAC at ¶¶ 79, 82, 96-99.  Midwest has not plead that B&T/MAS had sales below their measure of costs, then subsequently raised prices to recoup its losses.  Midwest also has not alleged that B&T/MAS's fees qualify as supracompetitive monopoly pricing as required to maintain a claim for predatory pricing. In a predatory pricing case, "the plaintiff must demonstrate that there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation." Brooke Group Ltd, 509 U.S. at 225-6.  The FAC fails to allege that the unlisted fees, combined with B&T/MAS' commission pricing, are priced above a competitive level. Merely charging additional prices is insufficient; the predator must charge supracompetitive prices that only a monopolist can charge because the competition has disappeared.  See Weyhauser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318 (2007).

In analyzing a predatory pricing claim, the Sixth Circuit requires a court to examine a defendant's "overall" pricing scheme within a particular market to determine if a price is below the average variable cost.  While Midwest alleges that B&T/MAS have monopolized, or attempted to monopolize, the relevant market through obtaining contracts with 6 different governmental agencies, Midwest alleges only "occasional" below average variable cost pricing.  FAC at ¶ 67.  This is insufficient.

Moreover, the so called unlisted fees are within the relevant market.  Midwest

24

says the relevant market in this case is the "auction services market" within Wayne County.  In servicing a single contract within this market, Midwest alleges that B&T charges the unlisted fees to purchasers of the vehicles.  These unlisted fees, however, are within the relevant product market of auction services.  In Directory Sales Management Corp. v. Ohio Bell Telephone Co., 833 F.2d 606, 613 (6th Cir. 1987), the Sixth Circuit held that the plaintiff's predatory pricing claim must fail because the plaintiff was unable to show that the defendant's pricing mechanism produced a loss to the defendant's "operations taken as a whole."  Like Directory Sales, where the plaintiff alleged that the Yellow Pages was the relevant product market and the defendant's offer of a free initial listing constituted predatory pricing, Midwest here alleges that the relevant market is providing "auction services" and B&T's towing rate is predatorily low.  Because the relevant market here is "auction services," the appropriate inquiry is to consider B&T's "operations taken as a whole."  B&T's towing rate, commission charges and the unlisted fees are not separate product markets, just as the Yellow Pages market was not different from the first listing market in Directory Services.

In Spirit Airlines v. Northwest Airlines, 431 F.3d 917 (6th Cir 2005), the Sixth Circuit held that leisure or price sensitive travelers could be considered a separate market from "local or connecting" passengers with respect to the Detroit-Boston and Detroit-Philadelphia flights.  The plaintiff claimed that the defendant engaged in predatory pricing that targeted the price sensitive customer, meaning that the price sensitive customer was the relevant market.  The defendant argued that the market was broader than just price sensitive customers, and relied upon the holding in Directory Sales in urging the district court to consider the defendant's overall costs for these two

25

flights in analyzing whether it engaged in predatory pricing.  Since the defendant made a profit on these two routes, it argued that it did not engage in predatory pricing.  The district court agreed.  The Sixth Circuit, however, reversed and held that it was reasonable for the trier of fact to conclude that there were two distinct markets, one for the price sensitive customer and another market for other customers.  Therefore, in determining if the defendant engaged in predatory pricing, the district court should only consider the defendant's costs with respect to the price sensitive customer.

Here, Midwest's predatory pricing claims are factually distinguishable from Spirit Airlines.  Midwest has claimed that there is only one market, being the market for auction services.  The plaintiff in Spirit Airlines argued that there were two separate and distinct markets.  The unlisted fees, as well as the tow rate and commission charges, are part of B&T and MAS's overall pricing within the auction services market.  Moreover B&T and MAS, unlike the defendant in Spirit Airlines, never increased prices once competition (e.g. Midwest) was purportedly destroyed, as the unlisted fees were charged at the very first auction and every auction thereafter.  See FAC at ¶¶ 79, 82, 96-99.

Finally, occasional low pricing is not sufficient to allege an antitrust injury due to predatory pricing.  Midwest argues that it has adequately alleged an antitrust claim because it has alleged that "After being awarded the contract; and once becoming the only vendor to provide the services, Defendants B&T/MAS charged the consumers multiple undisclosed fees."  Midwest Resp., p. 11, citing FAC at ¶¶ 82, 91.  The FAC also identifies six government agencies that B&T alleges services, yet fails to allege that B&T/MAS has engaged in predatory pricing with respect to these agencies.  FAC at ¶

26

67.  Courts are skeptical of a plaintiff's attempt "to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer."  Ponder v. Morgan, 892 F.2d 1355, 1362 (8th Cir. 1989), citing Directory Sales, 833 F.2d at 614; see also Ramallo Bros. Printing, Inc. v. El Dia, Inc., 392 F. Supp. 2d 118, 140 (Dist. Ct. P.R. 2005) ("Predation claims cannot be based on occasional instances of allegedly predatory pricing, because they are not likely to drive rivals from the market and to permit the predator to raise prices and profits subsequently.  A predatory pricing plaintiff can prevail only by adducing evidence suggesting defendants' overall price structure was predatory, not that a small minority of sales were below average variable cost.").  Here, Midwest has alleged B&T and MAS engaged in predatory pricing on but a single contract with Wayne County.  Midwest has not alleged that B&T/MAS obtained their purported 75% market share through predatory pricing and subsequent recoupment, or that B&T achieved this purported market share through predatory pricing.

Overall, Midwest has failed to plead a plausible claim for predatory pricing.  Counts IX and XIV must therefore be dismissed.

### D.  State Action Doctrine

Defendants also argue that even if Midwest had properly plead antitrust claims, they are entitled to immunity from these claims under the state action doctrine.  While defendants spend a good deal of time on this argument, the Court declines to address it in light of concluding that Midwest has failed to allege any plausible antitrust claims, however well-taken the argument may be.

### D.  Tort Claims

27

1.

Defendants also argue that Midwest's tort claims under Counts III, X and XV alleging tortious interference with a business relationship or expectancy fail.

Count III alleges that McNeal, Wayne County's former Purchasing Director, is liable for tortious interference with a business expectancy. Wayne County and McNeal argue that this claim must be dismissed because: (1) the business relationship must be more than a mere expectancy; and (2) a party cannot tortiously interfere with its own contract and/or business expectancy. A competitive bid process does not rise to the requisite level of a business expectancy, and Midwest has not alleged that McNeal was a "third party" to the business relationship. Dzierwa v. Michigan Oil Co., 152 Mich. App. 281, 287 (1986). The Court agrees.

In order to establish a claim for tortious interference with a business relationship or expectancy under Michigan law, the plaintiff must show (1) the existence of an advantageous relationship with a third party of which the defendant is aware, (2) with which the defendant intentionally and improperly interferes, (3) resulting in a termination of the relationship or expectancy, and (4) causing damage to the party whose interest has been terminated. Mino v. Clio School District, 255 Mich. App. 60, 78 (2003). "One who alleges tortious interference with a . . . business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the . . . business relationship of another." CMI Int'l, Inc v. Intermet Int'l Corp., 251 Mich. App. 125, 131 (2002) (citation omitted).

Here, there are no circumstances under which Midwest can plausibly plead that the business expectancy at issue, a competitively bid county contract, was more than

28

"wishful thinking." Trepel v. Pontiac Osteopathic Hospital, 135 Mich. App. 361, 377 (1984). Midwest has not alleged that there was a reasonable probability it was going to receive the contract. As described above, Wayne County had discretion under the Invitation to accept or reject, in whole or in part, any aspect of the bids. As such, McNeal was well within this discretion when he adjusted Midwest's bid. Midwest has therefore failed to plead a reasonable expectation or probability it was going to be awarded the bid.

Second, a contracting party may not be held liable in tort for interfering with his or her own contract. Reed v. Michigan Metro Girl Scout Council, 201 Mich. App. 10 (1993). "[I]t is now settled law that corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation." Id. at 13 (emphasis added).

While Midwest alleges generally that McNeal received improper consideration and acted outside the scope of his authority, FAC at ¶ at 146, 147, these allegations are conclusory and lack specific factual underpinning. Further, the sole personal benefit alleged in paragraph 145 of the FAC is McNeal's promotion. But other than timing, there is no alleged corollary between the alleged conduct and McNeal's promotion. This is simply insufficient. Finally, by accepting the lowest, responsive bid after B&T's bid protest, McNeal acted pursuant to Wayne County's best interests.

Overall, Midwest has not stated a claim for tortious interference with a business expectation stemming from McNeal's actions. Count III must be dismissed.

Regarding B&T and MAS, which are the subject of Counts X and XV, Midwest's claims falls short. As B&T and MAS point out, the Michigan Court of Appeals has held

29

that a disappointed bidder on a public contract lacks standing to sue for tortious interference.  Groves v. Dept. of Corrections, 295 Mich. App. 1 (2011).

The FAC alleges that Midwest had a valid business expectancy with respect to the Invitation, because it was purportedly in a position to obtain the Auction Contract but for the actions of the defendants.  FAC at ¶¶ 259, 260, 326, 327.  However, as a disappointed bidder on a public contract, Midwest does not have a valid expectancy. "Indeed, where the government has a great deal of discretion to choose its contractors, a bidder has no expectancy in the contract to be awarded."  Groves, at 5.  Only allegations of fraud, abuse, or illegality provide the basis for a court to review the public bidding process, but only the proper public official may bring such an action.  Id. At 7 (citation omitted).

Here, Wayne County had broad discretion as the Invitation provided Wayne County the right to accept or reject any and all bids.  If fraud, abuse, or illegality had actually occurred, that cause of action belonged to Wayne County, not Midwest. Accordingly, Midwest has not stated a claim for tortious interference against B&T or MAS.  In other words, because Wayne County is both a governmental entity and is required, as a result of its operating structure, to exercise a great deal of discretion in selecting the lowest responsible bidder, Midwest cannot plausibly have an expectancy interest in the contract at issue.  Midwest has therefore failed to state a claim for tortious interference against defendants.

2.

Midwest alleges a civil conspiracy under Counts IV (against McNeal) and XI

(against MAS).  In Michigan, a claim for conspiracy depends on an underlying viable tort claim.  <u>Cleary Trust v. Edward-Marlah Muzyl Trust</u>, 262 Mich.App. 485, 508 (2004).  Because Midwest has not alleged a valid claim for tortious inference, the civil conspiracy claim stands alone.  As such, Midwest's civil conspiracy claims must be dismissed.

### E.  Midwest's Arguments

In response to defendants' motions, Midwest makes several arguments, the majority of which have already been discussed.  Briefly, Midwest says that it has alleged an antitrust injury.  Midwest has conflated antitrust injury and antitrust standing.  As this Court has noted and stated above "[t]he related concepts of antitrust injury and antitrust standing are often confused."  <u>Baum Research & Dev. Co. v. Hillerich & Bradsby Co.</u>, 31 F. Supp. 2d 1016 (E.D. Mich. 1998).  There is a two-prong test for antitrust injury.  It requires:  "(1) that the alleged violation tends to reduce competition in some market <u>and</u> (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions."  <u>Tennessean Truckstop, Inc. v. NTS, Inc.</u>, 875 F.2d 86, 88 (6th Cir. 1989).

Midwest also argues that it is sufficient, under <u>Twombly</u> and <u>Iqbal</u>, to simply give notice of potential opportunities to conspire to state an antitrust claim.  Not so.  The gravamen of Midwest's allegations suggesting the existence of a conspiracy by defendants to violate the antitrust laws are as follows:

•　McNeal's direct dial telephone which was available on the internet.  FAC at ¶ 57;

•　Futuna and Napoleon having direct access to McNeal as an employee of Wayne County.  FAC at 58; and

- Futuna and Napoleon attending events with the vari[ous] Fiore representatives [related to defendant B&T and MAS] like birthday parties, election parties, campaign fundraisers and charity events like the annual Easter egg hunt.

Midwest relies on Buddie Contracting v. Seawright, 595 F. Supp. 422 (N.D. Ohio 1984) to argue it has alleged an antitrust claim. Midwest's reliance is Buddie is misplaced. It was decided before Tennessean Truckstop and makes the now inaccurate statement that ""[t]he terms antitrust injury and antitrust standing are used almost interchangeably in this area of law. For ease of reference, the Court will phrase its discussion of these terms as 'antitrust standing.'" Id. at 432. Moreover, Buddie is factually distinct. In Buddie, a grand jury indicted a government agent, the successful vendor, and its president for actions taken during the award of a contract. All of them plead guilty to having an unlawful interest in a public contract. Faced later with antitrust claims, the district court held that tampering with the bidding process can result in liability. Unlike the complaint in Buddie, which contained detailed factual allegations based on the criminal case, the FAC contains no specific allegations against defendants to confer antitrust liability.

Similarly, in In re Polyurethane Foam, 799 F. Supp. 2d 777 (N.D. Ohio 2001), which Midwest also cites, the district court relied heavily on "specific admissions . . . [extracted from a governmental investigation] that directly support[ed] the existence of a conspiratorial agreement." Id. at 782.

The Court's analysis set forth above demonstrates that Midwest has not plead an antitrust injury. Midwest only alleges that itself and other competitors were harmed by B&T being awarded the contract after a competitive bid process. There are no allegations of reduced competition in the alleged market of the "auction services

32

industry" (i.e. that there are fewer competitors submitting bids for publicly bid contracts). The only allegation of injury is Midwest's alleged financial losses because it was not the lowest bidder. Midwest has not plead any injury resulting from a decrease in the alleged auction services industry. Rather, Midwest's concerns stem from competition between the two companies-with Wayne County in the middle.

V. Conclusion

In the end, this case is about a disappointed bidder on a single contract. The contract went to the lowest bidder, a competitor. This is not an antitrust case and the defendants did not engage in tortious or otherwise unlawful conduct. The FAC fails to plead any plausible claims for relief based on the alleged conduct. Accordingly, defendants' motions to dismiss are GRANTED. This case is DISMISSED.

SO ORDERED.


S/Avern Cohn
AVERN COHN
UNITED STATES DISTRICT JUDGE


Dated: August 14, 2012


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, August 14, 2012, by electronic and/or ordinary mail.


S/Julie Owens
Case Manager, (313) 234-5160